**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                               )
WMI LIQUIDATING TRUST,                         )
                                               )
              Plaintiff,                       )
                                               )
       v.                                      )        Civil Action No. 14-1816 (RBW)
                                               )
FEDERAL DEPOSIT INSURANCE                      )
CORPORATION,                                   )
                                               )
              Defendant.                       )
———————————————————————)

**MEMORANDUM OPINION**

     The plaintiff, WMI Liquidating Trust, the successor-in-interest to Washington Mutual,

Inc., a now-defunct multiple savings and loan holding company that owned Washington Mutual

Bank ("WMB") and WMI Investment Corporation ("WMI"),[1] filed this civil suit against the

defendant, the Federal Deposit Insurance Corporation ("FDIC"), seeking judicial review under

the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (2012), and relief from the

FDIC's refusal to approve "golden parachute payments" that the plaintiff proposed to pay former

employees and officers of the debtors.  Complaint ("Compl.") ¶¶ 1-14, 50-67.  Currently pending

before the Court are the parties' cross-motions for summary judgment.  Plaintiff WMI

Liquidating Trust's Motion for Summary Judgment ("Pl.'s Mot."); Defendant's Motion for

Summary Judgment ("Def.'s Mot.").  After careful consideration of the parties' submissions,[2]

---

[1]  Hereinafter, WMB and WMI will be collectively referred to as the "debtors" because they are in Chapter 11 bankruptcy proceedings.  Complaint ("Compl.") ¶ 17.

[2]  In addition to the filings already identified, the Court considered the following documents in rendering its decision: (1) the Joint Appendix ("J.A."); (2) the Memorandum of Points and Authorities in Support of WMILT's Motion for Summary Judgment ("Pl.'s Mem."); (3) the Defendant's Memorandum of Points and Authorities in Opposition to [the] Plaintiff's Motion for Summary Judgment ("Def.'s Opp'n"); (4) Plaintiff WMI Liquidating Trust's Reply in Support of its Motion for Summary Judgment ("Pl.'s Reply"); (5) the Defendant's Memorandum of
                                                                              (continued . . .)

the Court concludes that it must grant in part and deny in part the plaintiff's motion, grant in part and deny in part the defendant's motion, and remand the case to the FDIC for further consideration consistent with this opinion.

## I.    BACKGROUND

### A.    Statutory And Regulatory Background

The Federal Deposit Insurance Act ("FDIA") gives the FDIC the power to "prohibit or limit, by regulation or order, any golden parachute payment."  12 U.S.C. § 1828(k)(1) (2012).  A "golden parachute payment" is defined as

> any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party[3] pursuant to an obligation of such institution or covered company that—
>
> (i)    is contingent on the termination of such party's affiliation with the institution or covered company; and—
>
> (ii)   is received on or after the date on which—
>
>> (I)    the insured depository institution or covered company, or any insured depository institution subsidiary of such covered company, is insolvent;
>>
>> (II)   any conservator or receiver is appointed for such institution;
>>
>> (III)  the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as

---

(. . . continued)
Points and Authorities in Support of Motion for Summary Judgment ("Def.'s Mem."); (6) Plaintiff WMI Liquidating Trust's Response in Opposition to Defendant FDIC's Motion for Summary Judgment ("Pl.'s Opp'n"); (7) the Defendant's Reply in Support of Motion for Summary Judgment ("Def.'s Reply"); and (8) the Notice of Submission of FDIC Final Determination Regarding Second Application to Make Payments Pursuant to 12 C.F.R. § 359 ("Notice").

[3]  An "institution-affiliated party" or an "IAP" is "any director, officer, [or] employee . . . of . . . an insured depositary institution or depository institution holding company," or "any other person as determined by the appropriate federal banking agency . . . who participates in the conduct of the affairs of an insured depositary institution . . . ." 12 U.S.C. § 1813(u); see also 12 C.F.R. § 359.1(h) (2012).

defined in the regulations prescribed pursuant to section 1831i(f) of this title);

(IV)  the insured depository institution has been assigned a composite rating by the appropriate Federal banking agency or the Corporation of 4 or 5 under the Uniform Financial Institutions Rating System; or

(V)  the insured depository institution is subject to a proceeding initiated by the Corporation to terminate or suspend deposit insurance for such institution.

12 U.S.C. § 1828(k)(4)(A); see also 12 C.F.R. § 359.0(b) (2012) ("A 'golden parachute payment' is generally considered to be any payment to an IAP which is contingent on the termination of that person's employment and is received when the insured depository institution making the payment is troubled or, if the payment is being made by an affiliated holding company, either the holding company itself or the insured depository institution employing the IAP, is troubled."); 12 C.F.R. § 359.1(f).  The FDIA includes a list of factors that the FDIC "may" consider in prescribing any regulation concerning the approval of golden parachute payments:

(A)  [w]hether there is a reasonable basis to believe that the institution-affiliated party has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or covered company that has had a material [e]ffect on the financial condition of the institution[;]

(B)  [w]hether there is a reasonable basis to believe that the institution-affiliated party is substantially responsible for—

(i)  the insolvency of the depository institution or covered company;

(ii) the appointment of a conservator or receiver for the depository  institution; or

(iii)  the troubled condition of the depository institution (as defined in the regulations prescribed pursuant to section 1831i(f) of this title)[;]

(C)  [w]hether there is a reasonable basis to believe that the institution-affiliated party has materially violated any applicable [f]ederal or [s]tate banking law or

regulation that has had a material [e]ffect on the financial condition of the institution[;]

(D) [w]hether there is a reasonable basis to believe that the institution-affiliated party has violated or conspired to violate—

   (i)   section[s] 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of Title 18; or

   (ii)  section[s] 1341 or 1343 of such title affecting a federally insured financial institution[;]

(E) [w]hether the institution-affiliated party was in a position of managerial or fiduciary responsibility[; and]

(F) [t]he length of time the party was affiliated with the insured depository institution or covered company, and the degree to which—

   (i)   the payment reasonably reflects compensation earned over the period of employment; and

   (ii)  the compensation involved represents a reasonable payment for services rendered.

12 U.S.C. § 1828(k)(2)(A)-(F).  The FDIC has promulgated several regulations concerning golden parachute payments.  See, e.g., 12 C.F.R. § 359.2 ("No insured depository institution or depository institution holding company shall make or agree to make any golden parachute payments . . . .").  Under the regulations, the prohibition against golden parachute payments applies to: (1) "troubled insured depository institutions which seek to enter into contracts to pay or to make golden parachute payments to their IAPs"; (2) "depository institution holding companies which are troubled and seek to enter into contracts to pay or to make golden parachute payments to their IAPs"; and (3) "healthy holding companies which seek to enter into contracts to pay or to make golden parachute payments to IAPs of a troubled insured depository institution subsidiary."  Id. § 359.0(b).  The regulations, however, provide limited exceptions for dispersing what would otherwise be prohibited golden parachute payments if:

(1) [t]he appropriate federal banking agency, with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible[4]; or

(2) [s]uch an agreement is made in order to hire a person to become an IAP either at a time when the insured depository institution or depository institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the criteria set forth in § 359.1(f)(1)(ii), and the institution's appropriate federal banking agency and the [FDIC] consent in writing to the amount and terms of the golden parachute payment. Such consent by the FDIC and the institution's appropriate federal banking agency shall not improve the IAP's position in the event of the insolvency of the institution since such consent can neither bind a receiver nor affect the provability of receivership claims. In the event that the institution is placed into receivership or conservatorship, the FDIC and/or the institution's appropriate federal banking agency shall not be obligated to pay the promised golden parachute and the IAP shall not be accorded preferential treatment on the basis of such prior approval[5]; or

(3) [s]uch a payment is made pursuant to an agreement which provides for a reasonable severance payment, not to exceed twelve months salary, to an IAP in the event of a change in control of the insured depository institution; provided, however, that an insured depository institution or depository institution holding company shall obtain the consent of the appropriate federal banking agency prior to making such a payment and this paragraph (a)(3) shall not apply to any change in control of an insured depository institution which results from . . . the insured depository institution being placed into conservatorship or receivership . . . .[6]

12 C.F.R. § 359.4(a)(1)-(3).

Qualifying for any of these exceptions requires a two-step process. First,

(4) [a]n insured depository institution, depository institution holding company or IAP making a request pursuant to paragraphs (a)(1) through (3) of this section shall demonstrate that it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be made, that:

---

[4] The parties characterize this exception as the "permissibility" exception. E.g., Pl.'s Mem. at 7; Def.'s Mem. at 24.

[5] This is referred to as the "white knight" exception. E.g., Pl.'s Mem. at 7; Def.'s Mem. at 24. "The FDIC uses the term white knight to refer to a highly sought after business person recruited by a troubled institution to reverse its slide toward economic failure." McCarron v. FDIC, 111 F.3d 1089, 1096 n.3 (3d Cir. 1997).

[6] The parties refer to this exception as the "Change in Control" exception. E.g., Pl.'s Mem. at 7; Def.'s Mem. at 24.

(i) The IAP has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or depository institution holding company that has had or is likely to have a material adverse effect on the institution or holding company;

(ii) The IAP is substantially responsible for the insolvency of, the appointment of a conservator or receiver for, or the troubled condition, as defined by applicable regulations of the appropriate federal banking agency, of the insured depository institution, depository institution holding company or any insured depository institution subsidiary of such holding company;

(iii) The IAP has materially violated any applicable federal or state banking law or regulation that has had or is likely to have a material effect on the insured depository institution or depository institution holding company; and

(iv) The IAP has violated or conspired to violate section[s] 215, 656, 657, 1005, 1006, 1007, 1014, 1032, or 1344 of title 18 of the United States Code, or section[s] 1341 or 1343 of such title affecting a federally insured financial institution as defined in title 18 of the United States Code.

12 C.F.R. § 359.4(a)(4); see also 12 C.F.R. § 303.244(c)(6) (applying for golden parachute payments entails "[c]ertification and documentation as to each of the points cited in § 359.4(a)(4)"); Hill v. Commerce Bancorp, Inc., No. 09-cv-3685(RBK/JS), 2012 WL 694639, at *7 (D.N.J. Mar. 1, 2012) (parties deemed "eligible to apply for the exception[s] to the golden parachute restrictions, as long as [applicants] are able to certify to . . . [the requirements of 12 C.F.R. § 359.4(a)(4)] (and can make other, similar certifications about the IAP)"), aff'd sub nom., Hill v. TD Bank, NA, 586 F. App'x 874 (3d Cir. 2014); Knyal, 2003 WL 26465939, at *4, *15-16.

Second, and notwithstanding the fact that the applicant has met its burden as outlined in 12 C.F.R. § 359.4(a)(4), the FDIC "may consider" the following in exempting certain payments from the golden parachute restrictions:

(1) [w]hether, and to what degree, the IAP was in a position of managerial or fiduciary responsibility;

(2) [t]he length of time the IAP was affiliated with the insured depository institution or depository institution holding company, and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and

(3) [a]ny other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) of the [FDIA] or this part.

Id. § 359.4(b)(1)-(3).

## B.     Factual And Procedural Background

On September 25, 2008, the Office of Thrift Supervision closed WMB and appointed the FDIC as receiver of the bank.[7]  Compl. ¶ 16; see also J.A. at AR 0003, 0964-66.  Immediately thereafter, the FDIC "sold substantially all of the assets of WMB to JPMorgan Chase Bank, [National Association]," Compl. ¶ 16; see also J.A. at AR 0003, and the debtors commenced Chapter 11 bankruptcy proceedings, Compl. ¶ 17; see also J.A. at AR 0967-78.  As part of the bankruptcy proceedings, many former officers and employees of the debtors filed claims (the "claimants") against the debtors, "seeking recovery from the WMI estate . . . , asserting that WMI owed them unearned severance and special bonus payments . . . ."  Def.'s Mem. at 6 (citing J.A. at AR 0315, 0318); see also Compl. ¶ 21.  Such recovery is sought by the claimants pursuant to various "employment contracts and employee benefit plans" that they executed with the debtors, Compl. ¶ 24, specifically "Change in Control Agreements," "Retention Bonus Agreements," "Severance Plans," "Signing Bonus Agreements," and "Equity Incentive Plans," J.A. at AR 1006-09; see also Compl. ¶ 24.

---

[7] "The FDIC operates in dual capacities . . . [as a] corporation and [a] receiver.  As a corporation[,] it insures bank deposits and acts as a regulator for financial institutions.  [And] [a]s a receiver, it steps into the shoes of failed banks and either (1) liquidates assets and pays off the banks' creditors and shareholders or (2) engages in a purchase and assumption transaction in which it sells the assets of the failed institution to another solvent bank."  Def.'s Mem. at 5 n.12 (citations omitted).

Years later, on March 6, 2012, the plaintiff assumed responsibility for the administration of the debtors' bankruptcy cases and the litigation against the claimants.  Compl. ¶ 18; see also J.A. at AR 0327-330.  Since assuming these responsibilities, the plaintiff has attempted to resolve all outstanding claims with the claimants, as the debtors' bankruptcy cases cannot be closed before these claims are resolved.  See Compl. ¶ 21.  "In furtherance of appropriately resolving all claims . . . , [the plaintiff] executed . . . [s]ettlement [a]greements with . . . [thirty of the] . . . [c]laimants . . . ."  Compl. ¶ 22; see also J.A. at AR 0994.  "Although the [s]ettling [c]laimants initially demanded in excess of $19,000,000, [the plaintiff] negotiated" the claimants "down to $2,800,000."  Def.'s Mem. at 8-9 (citing J.A. at AR 0997).

"[The plaintiff] sought to obtain regulatory approval for paying the [s]ettled [c]laims through a multi-step process" with the FDIC.[8]  Def.'s Mem. at 9 (citing J.A. at AR 0001-310).  Through this process, the FDIC advised the plaintiff that it "was a covered company subject to the [g]olden [p]arachute] [r]egulations" and that because the settlement agreements "provided for golden parachute payments," the payments "required regulatory approval."  Id. (citing J.A. at AR 0311-13); see also J.A. at AR 0312 ("[T]he [plaintiff] must file an application for regulatory approval to pay the settlements in accordance with [12 C.F.R. §§ 303.244, 359].  The [plaintiff] may not proceed with the settlement payments without approval from . . . the FDIC . . . .");  Compl. ¶¶ 36-37.  The plaintiff then submitted a payment application (the "application") to the FDIC, seeking approval for the proposed payments pursuant to the settlement agreements.[9]  J.A. at AR 0314-661.  The proposed payments considered each employment contract and benefit plan

---

[8]  Because the FDIC must approve the plaintiff's proposed payments, the settlement agreements are "technically . . . tentative" in nature.  J.A. at AR 1007.

[9]  The plaintiff amended the application twice to add and remove certain claimants.  See Def.'s Mem. at 9-10 (citing J.A. at AR 0933-47, 0954-63).

that each claimant alleged was a basis for seeking payment from the debtors.  See, e.g., id. at AR 0957-63 (itemizing and aggregating the "[d]isputed [c]omponents" and "[d]isputed [c]omponent [a]mounts" of each proposed payment to each claimant).  The FDIC rejected the plaintiff's application in its entirety, i.e., no component of any proposed payment to any claimant was approved.  Id. at AR 0992-1004, AR 1005-21.  The plaintiff now seeks judicial review of the FDIC's decision.

## II.   STANDARD OF REVIEW

In a case involving review of final administrative action, the summary judgment standard of review set forth in Federal Rule of Civil Procedure 56 does not apply.  E.g., Se. Conference v. Vilsack, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).  Rather, a court must "decid[e], as a matter of law, whether an agency action is supported by the administrative record and consistent with the . . . [arbitrary and capricious] standard of review [under the APA]."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

"Arbitrary and capricious" review is "highly deferential" and "presumes the agency's action to be valid."  Envt'l. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Rather, "court[s] consider[] whether agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  Fund for Animals v. Babbitt,

903 F. Supp. 96, 105 (D.D.C. 1995) (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360,

378 (1989)).  Courts "will uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned."  Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993)

(internal quotation marks omitted).  In sum, "when a party seeks review of agency action under

the APA, the district . . . [court] sits as an appellate tribunal," and "[t]he 'entire case' on review

is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)

(footnote and citations omitted).

## III.    ANALYSIS

### A.    Count One Of The Plaintiff's Complaint

Count one of the plaintiff's complaint seeks to set aside the FDIC's wholesale denial of

the plaintiff's payment application and its proposed payments to the claimants.  Compl. ¶¶ 50-58.

In making this challenge, the plaintiff does not dispute that the golden parachute regulations

promulgated by the FDIC are a reasonable interpretation of the FDIA, and thus they are entitled

to deference from the Court.  E.g., Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland

Sec., 769 F.3d 1127, 1135 (D.C. Cir. 2014) ("We generally accord substantial deference to an

agency's interpretation of both a statute it administers and its own implementing regulations.").

The plaintiff admits that under the FDIC's regulations it "is subject to the [g]olden [p]arachute

[r]egulations" and "cannot make the . . . [proposed] [p]ayments . . . as set forth in the . . .

[a]pplication without the regulatory approval that it has sought" from the FDIC.  Pl.'s Mem. at

13-14.  And the plaintiff concedes that, in the context of its application, the "only relevant

exception" to the prohibition against golden parachute payments is the permissibility exception

under 12 C.F.R. § 359.4(a)(1).  See Pl.'s Mem. at 20.  What causes the plaintiff concern,

however, is how the FDIC applied its regulations in the plaintiff's circumstances.  See id. at 14-

16 (FDIC failed to articulate adequately the bases for denying various components of proposed payments to certain claimants ); id. at 16 (FDIC did not "consider the 'degree of managerial or fiduciary responsibilities' of each . . . [c]laimant" as permitted by 12 C.F.R. § 359.4(b)(1)).[10]

### 1.   The FDIC's 12 C.F.R. 359.4(a)(4) Analysis

Even where an agency has adopted a reasonable construction of a governing statute, the Court "still must ensure that [the agency's] action is not otherwise arbitrary and capricious." Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 90 (D.C. Cir. 2010).  An agency may be said to have acted arbitrarily or capriciously when it disregards its established policy without adequate explanation.  See INS v. Yang, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the [APA]." (quoting 5 U.S.C. § 706(2)(A))); Commc'ns Satellite Corp. v. FCC, 836 F.2d 623, 629 (D.C. Cir. 1988) ("If, as [plaintiff] asserts, the [agency] has departed from established policy, then we must determine whether the agency has acted pursuant to 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'") (quoting Greater Bos. Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970)).

Here, in considering whether the plaintiff fulfilled its burden under 12 C.F.R. § 359.4(a)(4), see J.A. at AR 1003 (FDIC examined certifications from the plaintiff that none of the claimants (i) has committed any fraudulent act, breach of fiduciary duty, or insider abuse,

---

[10]  The plaintiff "withdr[ew]" one of its contentions that the FDIC acted arbitrarily and capriciously in denying the plaintiff's application.  See Notice at 2-3.  Accordingly, the Court need not address it.

with an adverse effect on the institution; (ii) is substantially responsible for insolvency or

troubled condition of, or the appointment of a receiver or conservator for, the institution; (iii) has

violated any state or federal banking law, with an adverse effect on the institution; or (iv) has

violated federal laws enumerated in 12 C.F.R. § 359.4(a)(4)(iv), the FDIC concluded that the

plaintiff failed to satisfy its burden, see id. (FDIC reasoning that certifications were submitted by

individuals who did not have "necessary knowledge to make [12 C.F.R. § 359.4(a)(4)]

attestations")—which the plaintiff has not contested.  This alone could have been a sufficient

basis for denying the plaintiff's payment application.  See, e.g., Batchelor v. Cornerstone Bank,

No. 13-cv-78-D, 2013 WL 5309578, at *5 (E.D.N.C. Sept. 19, 2013) ("In particular, [the

applicant]'s failure to provide the certification required by [12 C.F.R. § 359.4(a)(4)] provided

sufficient justification to deny the payments."); Knyal, 2003 WL 26465939, at *15 ("[12 C.F.R.

§ 359.4(a)(4)] is the mandatory part of the regulation, and it imposes a duty on the IAP or

depository institution, not on the agency.").  Yet, it does not appear that the FDIC identified this

deficiency as an independent basis for the wholesale rejection of the plaintiff's application.  See

J.A. at AR 1003-04 (FDIC's denial of the application because it generally did not satisfy 12

C.F.R. §§ 359.4(a)(1)-(3)); id. at AR 1019-20 (the plaintiff's failure to satisfy 12 C.F.R. §

359.4(a)(4) was a mere factor for consideration under 12 C.F.R. § 359.4(b)(3)).  The FDIC's

failure to address the impact of this flaw seemingly implies that applicants can qualify for

exceptions to golden parachute payments, even though they fail to satisfy their certification

obligations under 12 C.F.R. § 359.4(a)(4).  Such an implication runs counter to the plain

language of the regulation that the FDIC promulgated and conveys the perception of arbitrary

and capricious decisionmaking on its part.  See, e.g., U.S. Postal Serv. v. Postal Regulatory

Comm'n, No. 13-cv-1308, 2015 WL 2191023, at *15 (D.C. Cir. May 12, 2015) (suggesting that

remand is appropriate where an agency should clarify apparent inconsistencies in its

decisionmaking process); Shepherd v. Merit Sys. Prot. Bd., 652 F.2d 1040, 1043 (D.C. Cir.

1981) ("[W]e must overturn agency action and interpretation inconsistent with the regulations . .

. themselves.").  Therefore, remand is appropriate here so that the FDIC can clarify whether the

plaintiff's failure to satisfy its obligations under 12 C.F.R. § 359.4(a)(4) was alone sufficient to

reject the plaintiff's application.

### 2.    The FDIC's 12 C.F.R. 359.4(b) Analyses

#### a.    12 C.F.R. 359.4(b)(1) Analysis

As an initial matter, in examining the relevant data submitted by the plaintiff in support

of its application, the Court finds that the FDIC reasonably concluded that the claimants had

either managerial or fiduciary responsibilities while employed by the debtors.[11]  See J.A. at AR

1011-14 (describing managerial and fiduciary responsibilities of claimants); see also 12 C.F.R. §

359.4(b)(1); Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan, 512 F. Supp. 2d 32, 37 (D.D.C.

2007) ("Where an agency has acted in an area in which it has 'special expertise,' the court must

be particularly deferential to its determinations." (quoting Bldg. & Const. Trades Dep't, AFL-

CIO v. Brock, 838 F.2d 1258, 1266 (D.C. Cir. 1988))).

The plaintiff contends that the FDIC clearly erred in its analysis under 12 C.F.R. §

359.4(b)(1) because this regulation was only promulgated by the FDIC as a check against

awarding golden parachute payments to "senior executive officers responsible for the [debtors']

collapse."  Pl.'s Mem. at 18 (emphasis omitted).  But the plain language of 12 C.F.R. §

359.4(b)(1) is not so restrictive.  The restrictions on golden parachute payments were designed to

---

[11]  Of the thirty claimants with whom the plaintiff executed tentative settlement agreements, the plaintiff only
challenges the FDIC's 12 C.F.R. § 359.4(b)(1) analysis of twelve of those claimants.  See Pl.'s Mem. at 18.

weed out such payments to <u>institution-affiliated parties</u>, not just senior executive officers.  <u>See</u> Regulation of Golden Parachutes and Other Benefits Which are Subject to Misuse, 60 Fed. Reg. 16069-01, 16073 (Mar. 29, 1995) ("[I]n carefully reviewing the language of . . . [12 U.S.C. § 1828(k)(4)(A)], the FDIC is of the opinion that Congress intended to include within the statute's scope individuals who are institution-affiliated parties of depository institution holding companies . . . ."); <u>id.</u> at 16074 ("[I]n view of the fact that the statute uses the term 'institution-affiliated party,' the FDIC has chosen not to explicitly exclude employees who are not senior executive officers or directors . . . ."); Regulation of Golden Parachutes and Other Benefits Which are Subject to Misuse, 56 Fed. Reg. 50529-01, 50530 (Oct. 7, 1991) ("[I]nstitutions which were experiencing severe financial difficulties paid or agreed to pay substantial sums to <u>institution-affiliated parties</u>.  These payments were not in the best interests of the institution and, therefore, not in the best interest of the FDIC. They demonstrate the need for limitations on such payments in order to prevent the dissipation of an institution's assets and to protect the deposit insurance funds." (emphasis added)); J.A. at AR 0981 (same); <u>see also</u> 12 U.S.C. § 1813(u) (defining an IAP broadly).  The plaintiff has seemingly conflated 12 C.F.R. § 359.4(a)(4) with 12 C.F.R. § 359.4(b)(1).  It is incumbent on the plaintiff to certify that none of the claimants were responsible for the debtors' collapse <u>before</u> the FDIC even undertook an analysis of whether the plaintiff's proposed golden parachute payments are permissible.  <u>See</u> 12 C.F.R. § 359.4(a)(4); <u>Knyal</u>, 2003 WL 26465939, at *15.  In other words, under 12 C.F.R. § 359.4(b)(1), the FDIC need not weigh the role, if any, each claimant had with respect to the debtors' collapse.

### b.     12 C.F.R. 359.4(b)(2) Analysis

In October 2010, the FDIC published a Financial Institution Letter entitled "Guidance on Golden Parachute Applications" ("guidance").  J.A. at AR 0979.  The FDIC issued the guidance

"[a]s part of [its] supervisory efforts to address executive compensation in the financial services industry."  Id.  The guidance was intended to "clarif[y] the golden parachute application process for troubled institutions, specif[y] the type of information necessary to satisfy the certification requirements, and highlight[] factors considered by the supervisory staff when determining whether to approve a golden parachute payment."  Id.; see also id. at AR 0981 ("This guidance is intended to explain the golden parachute application process for troubled institutions and to instruct and advise bank management and supervisory personnel on the type of information that will be necessary to satisfy the requirements for applications by insured depository institutions and other covered companies seeking supervisory approval to enter into a contract to make, or to actually make, a golden parachute payment that is otherwise impermissible under existing law."); id. at AR 0982 ("There is also an expectation that [the golden parachute regulations will] continue to be applied in a consistent manner.  Consequently, the FDIC is providing this supervisory guidance to ensure that the original purposes of the statute and related rules are met.").  Specifically, the guidance noted that review of a payment application "should distinguish between . . . cases in which no payment (in any amount) would be appropriate . . . and cases in which payment might be appropriate, but not in the amount specified in the application."  Id. at AR 0987.

Here, the Court finds that the FDIC examined the relevant data and reasonably concluded that the component of any proposed payment attributable to a claim under a Change in Control Agreement ("Change in Control component") was not reasonable.[12]  J.A. at AR 1002; id. at 1016-17.  Notably, the plaintiff does not challenge the FDIC's conclusion that "the Change in Control  . . . [Agreements] were voided by operation of law under [12 C.F.R. § 163.39] . . . ."

---

[12]  Only twenty of the thirty claimants asserted a claim pursuant to a Change in Control Agreement.  See J.A. at AR 1016 n.42.

J.A. at AR 1002; see also Def.'s Opp'n at 18 & n.54.  And even if these agreements were valid,

the FDIC rationally explained that this component of the proposed payments was "explicitly

prohibited in the receivership context under the Change in Control [e]xception at [12 C.F.R. §

359.4(a)(3)]"—a fact uncontested by the plaintiff.  J.A. at AR 1017.

The plaintiff is nonetheless adamant that the FDIC's analysis is flawed in this instance

because while the FDIC "reli[ed] on the [Change in Control] [e]xception," it also claimed that

the Change in Control exception was "not at issue here."  Pl.'s Mem. at 19-21 (internal quotation

marks omitted).  However, the Court sees nothing clearly erroneous with the FDIC's analysis.

Neither the FDIA nor the implementing regulations bars the FDIC from considering whether a

proposed payment would satisfy 12 C.F.R. §§ 359.4(a)(2), (3), in assessing the reasonableness of

the proposed payment under 12 C.F.R. § 359.4(b)(2).  Although it would seemingly be rare, the

plain language of the regulations allows the FDIC to permit a golden parachute payment

pursuant to the permissibility exception under 12 C.F.R. § 359.4(a)(1), even where it would not

qualify for the exceptions set forth in 12 C.F.R. §§ 359.4(a)(2), (3).  This result is plausible

because even if the FDIC determines that the golden parachute payment is not reasonable under

12 C.F.R. § 359.4(b)(2), the other factors to consider may nevertheless weigh in favor of

permissibility.  See 12 C.F.R. §§ 359.4(b)(1), (3); see also Knyal, 2003 WL 26465939, at *16

("[T]he FDIC 'may' consider one, two, or all three of the . . . factors [in 12 C.F.R. §§

359.4(b)(1)-(3)].  None of the factors is controlling, and there is no requirement that more or less

weight be given to any of them.").  Moreover, the FDIC's interpretation of its regulations is

entitled to substantial deference.  E.g., Fogo De Chao, 769 F.3d at 1135.

The plaintiff also argues that the FDIC denied payment of any Change in Control

component of the proposed payments solely because the component did not qualify for the

16

Change in Control exception under 12 C.F.R. § 359.4(a)(3).  See Pl.'s Mem. at 21-22.  But the

plaintiff's position is predicated on a misunderstanding of the FDIC's analysis of the Change in

Control component of the proposed payments.  The fact that the Change in Control component of

the proposed payments did not qualify for the Change in Control exception was just <u>one</u> factor

that made this component of the proposed payments impermissible.  See J.A. at AR 1015-19

(conducting 12 C.F.R. § 359.4(b)(2) analysis in determining applicability of the permissibility

exception).  The administrative record shows that <u>other</u> variables that contributed to the FDIC's

decision to deny approval of the Change in Control component of the proposed payments are the

managerial and fiduciary responsibilities of each claimant, <u>see id.</u> at AR 1011-14 (conducting 12

C.F.R. § 359.4(b)(1) analysis in determining applicability of the permissibility exception), as

well as other factors that indicated that this component of the proposed payments was contrary to

the intent of 12 C.F.R. § 359 and the FDIA,[13] <u>id.</u> at AR 1019-20 (conducting 12 C.F.R. §

359.4(b)(3) analysis in determining applicability of the permissibility exception).[14]

---

[13]  According to the FDIC, its determination that the Change in Control component of the proposed payments was prohibited had "a significant impact on the perceived reasonableness of the . . . [p]ayments . . . globally and on an individual level." J.A. at AR 1017. "[O]nce the Change in Control . . . [component was] removed from consideration, the [p]roposed [p]ayment[s] . . . [were] in close proximity to 100% of the value of the claim for [those] [c]laimants [who had a Change in Control component to their proposed payments]." Id. This rationale, while reasonable and uncontested by the plaintiff, did not apply to two claimants: Bruce Bivert and Brian Foster. Compare J.A. at AR 1016 & n.42, with id. at AR 1017; see also Pl.'s Mem. at 15. Nevertheless, the FDIC reasonably rejected the remaining components of the proposed payments to Mr. Bivert and Mr. Foster. See J.A. at AR 0957 (other components of Mr. Bivert's proposed payment are pursuant to Retention Bonus Agreement and Equity Incentive Plan); id. at AR 0959 (other components of Mr. Foster's proposed payment are Retention Bonus Agreement and Equity Incentive Plan); id. at AR 1008-09 (explaining that "[t]here was no assigned dollar amount for the benefits allegedly owed under the Equity Incentive Plan"); id. at AR 1017-18 (rejecting Retention Bonus Agreement component of proposed payments); see also Def.'s Opp'n at 21 ("Given that the Equity Incentive Plan contained no assigned dollar amount, there was no basis for the FDIC to assess the reasonableness of the Proposed Payment amount tied to that agreement.").

[14]  The plaintiff faults the FDIC for "fail[ing] to consider any factors whatsoever for [the] proposed . . . [p]ayments based on the Signing Bonus Agreement or [the] Equity Incentive Plan." Pl.'s Mem. at 16. In opposition, the FDIC cites record evidence showing that it did consider those factors. See Def.'s Opp'n at 21-22. The plaintiff has not responded further on this point, and thus the Court treats the FDIC's argument as conceded. E.g., Patriot-BSP City Ctr. II v. U.S. Bank Nat'l Ass'n, 715 F. Supp. 2d 91, 98 (D.D.C. 2010) ("Because the plaintiffs fail to address the defendants' [argument] . . . in their reply, the [C]ourt treats this . . . [argument] as conceded."). In any event, the

(continued . . .)

Where the FDIC has gone somewhat awry, however, is concluding that the component of the proposed payments attributable to a claim under a Retention Bonus Agreement ("Retention Bonus component") was not reasonable as to all claimants. See J.A. at AR 1017-18. Almost all of the claimants who had a Retention Bonus component in their proposed payments executed their Retention Bonus Agreements between "August and September 2008, leaving mere months and days to 'earn' the retention award prior to" the debtors' collapse. Id. at AR 1017. Thus, the FDIC rejected this component of the proposed payments because "the payments contemplated under the Retention Bonus Agreements bear no relation to payment for services rendered over the duration of the [c]laimants' employment," and such payments were "contrary to the intent of the [FDIA]." Id. at AR 1018. But the FDIC also recognized that there was one "exception" that defied its logic—William Finzer, a claimant who had executed a Retention Bonus Agreement in 2006—well before the debtors' collapse in 2008. Id. at AR 1017-18 & n.52. And without any additional, rational explanation, the FDIC rejected this component of the proposed payment to Mr. Finzer. It is not apparent that this was the product of reasoned decisionmaking, and thus the Court must set aside the agency's decision with respect to the Retention Bonus component of the proposed payment to Mr. Finzer[15] and remand this aspect of the decision to the FDIC for further consideration.[16]

_____

(. . . continued)
Court agrees with the FDIC that it did consider the reasonableness of the components of the proposed payments related to Signing Bonus Agreements and Equity Incentive Plans, see Def.'s Opp'n at 21-22 (citing J.A. at AR 1008-09); J.A. at AR 1018-19, even though the FDIC did not necessarily need to consider the reasonableness of these components, see Knyal, 2003 WL 26465939, at *16 ("[T]he FDIC 'may' consider one, two, or all three of the . . . factors [in 12 C.F.R. §§ 359.4(b)(1)-(3)].").

[15]  On remand, it may well be the case that the FDIC concludes that the Retention Bonus component of the proposed payment to Mr. Finzer is reasonable, but that conclusion still would not compel the FDIC to permit payment to Mr. Finzer, as the FDIC could afford more weight to the other factors in 12 C.F.R. § 359.4(b)(1) and 12 C.F.R. § 359.4(b)(3), and deny approval of this component of the proposed payment to Mr. Finzer. Knyal, 2003 WL 26465939, at *16 ("[T]he FDIC 'may' consider one, two, or all three of the . . . factors [in 12 C.F.R. §§ 359.4(b)(1)-
(continued . . .)

### B.      Count Two Of The Plaintiff's Complaint

Count two of the plaintiff's complaint "seek[s] a declaration, under the applicable standard of review for an APA action, of the same rights that it seeks in [count] [one]."  Pl.'s Opp'n at 16; see also Compl. ¶¶ 59-67.  The FDIC moves to dismiss count two of the complaint because, inter alia, it is duplicative of count one.  See Def.'s Mem. at 32.  The Court agrees with the FDIC.

A court may dismiss duplicative claims in its discretion.  See, e.g., Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1, 81 (D.D.C. 2010) (stating that, "[a]s a matter of judicial economy, courts should dismiss" duplicative claims).  Claims are duplicative when they "stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available."  Id. at 81.  Here, because count two "does not present any legal or factual theories that are not already subsumed in . . . [count one]," Rodriguez v. Lab. Corp. of Am. Holdings, 13 F. Supp. 3d 121, 128 (D.D.C. 2014), the Court will dismiss count two.

---

(. . . continued)

(3)].  None of the factors is controlling, and there is no requirement that more or less weight be given to any of them.").

[16] The plaintiff does not raise any issues with the FDIC's analysis under 12 C.F.R. § 359.4(b)(3), so the Court need not scrutinize that analysis.  This brings the Court to an interesting observation.  It appears that the FDIC rejected the entirety of the plaintiff's application on the basis that the 12 C.F.R. §§ 359.4(b)(1),(3) factors significantly outweighed the 12 C.F.R. § 359.4(b)(2) factor.  See J.A. at AR 1000 ("[C]onsideration of . . . [12 C.F.R. § 359.4(b)(1)] weighs strongly against permitting the [proposed] payment[s]."); id. at AR 1002 ("[T]here are several reasons that support not affording . . . [12 C.F.R. § 359.4(b)(2)] significant weight in making a determination."); id. ("The precarious financial position of the . . . [debtors] heavily weighs against approval of the [a]pplication."); id. at AR 1004 (concluding that 12 C.F.R. §§ 359.4(b)(1),(3) "heavily support denial of the [plaintiff's request").  In other words, regardless of whether the proposed payments were reasonable, the FDIC seemingly would have nevertheless refused to approve them.  It follows that even if the FDIC's 12 C.F.R. § 359.4(b)(2) analysis is left uncorrected, it presumably would not change the agency's ultimate decision to deny the application in its entirety, and thus remand would be unnecessary.  See, e.g., Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("Courts reviewing agency action under section 706(2)(A)'s 'arbitrary and capricious' standard must take 'due account . . . of the rule of prejudicial error.'  The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'" (quoting 5 U.S.C. § 706 and PDK Labs., Inc. v. U.S. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004))).  But because the FDIC has not considered this rationale at the administrative level—and perhaps it should on remand—the Court cannot entertain it.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that it must remand this case to the FDIC so that it can, at a minimum: (1) clarify why the plaintiff's apparent failure to comply with the certification requirements of 12 C.F.R. § 359.4(a)(4) is insufficient alone to deny the plaintiff's golden parachute payment application and (2) consider further the Retention Bonus component of the proposed payment to William Finzer.  Additionally, count two of the complaint must be dismissed as it is duplicative of count one.

**SO ORDERED** this 9th day of June, 2015.[17]

REGGIE B. WALTON
United States District Judge

---

[17] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.  Additionally, the Court is aware that a related case has been filed, which generally concerns the FDIC's denial of a second golden parachute payment application filed by the plaintiff.  See Complaint ¶¶ 11-18, WMI Liquidating Trust v. FDIC, No. 15-cv-751 (D.D.C. May 13, 2015), ECF No. 1.  In issuing this Memorandum Opinion and the accompanying Order in an expeditious manner, the Court hopes that the parties can narrow the issues in that case.